UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

                    Plaintiff,                        Civ No. 8:13-cv-123T-33EAJ

vs.

INNOVATIVE WEALTH BUILDERS, INC.;
et al.,

                    Defendants.
_____/

**RECEIVER'S MOTION FOR ENTRY OF ORDER DIRECTING NON-PARTY
IRN PAYMENT SYSTEMS TO SHOW CAUSE WHY IT SHOULD NOT BE HELD IN
CONTEMPT FOR ITS REFUSAL TO COMPLY WITH THE COURT'S ORDERS
AND INCORPORATED MEMORANDUM OF LAW**

        Mark J. Bernet, as Receiver for Innovative Wealth Builders, Inc. and its affiliates,

subsidiaries, divisions, or business or sales operations, wherever located (hereafter the

"Receiver"), moves this Court for entry of an order directing non-party Independent Resources

Network Corp., d/b/a IRN Payment Systems ("IRN") to appear and show cause why it should not

be held in contempt of this Court for its intentional and willful refusal to comply with the Court's

Temporary Restraining Order and Preliminary Injunction.   In support of this Motion, the

Receiver submits the following Memorandum.

**PRELIMINARY STATEMENT**

        The Court has directed the Receiver to take possession of all of the assets of the corporate

defendant, Innovative Wealth Builders, Inc. ("Innovative Wealth Builders"), and it has directed

all persons who have possession of any such assets to deliver them to the Receiver. By far, the

largest single asset that the Receiver has discovered is $703,631.87 held in a reserve account,

under the control of Independent Resources Network Corp., d/b/a IRN Payment Systems ("IRN"). IRN is a credit and debit card processing company which processed credit and debit card transactions for Innovative Wealth Builders. Unfortunately, IRN refuses to comply with this Court's orders, and it has withheld the funds from the Receiver. The Receiver therefore is compelled to request that this Court enter an order directing IRN to show cause why it should not be held in contempt and, after it fails to make an adequate showing, direct it to turn over the reserve funds to the Receiver, and impose additional sanctions.

## I.  PROCEDURAL BACKGROUND

The Federal Trade Commission (the "FTC") commenced this case by filing its Complaint on January 14, 2013, alleging that the Defendants had engaged in unfair and deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a). (Doc. No. 1). The FTC further alleged that the Defendants had violated the Telemarketing Sales Rule, 16 CFR Part 310. The same day, the FTC filed *Plaintiff Federal Trade Commission's Ex Parte Motion for a TRO with an Asset Freeze, the Appointment of a Receiver and other Equitable Relief and an Order to Show Cause why a Preliminary Injunction should not Issue*, along with a supporting memorandum of law (Doc. Nos. 3 & 4) (together the "Motion for TRO"). By this Motion for TRO, the FTC requested the appointment of a temporary receiver over the corporate defendant Innovative Wealth Builders.

Thereafter, the Court granted the Motion for TRO by entering an *Ex Parte Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, other Equitable Relief, and Order to Show Cause why a Preliminary Injunction should not Issue* (hereafter the "TRO") (Doc. No. 11). Among other things, the TRO (i) enjoined the Defendants from violating Section 5(a) of the FTC Act and the Telemarketing Sales Rule, (ii) enjoined the Defendants from

transferring, liquidating or otherwise encumbering or disposing of any of their assets; and (iii) appointed the Receiver as the temporary receiver of Innovative Wealth Builders and "any of its affiliates, subsidiaries, divisions, or business or sales operations, wherever located . . . ." TRO, Section VIII, p. 14.  In the TRO, the Court charged the Receiver with various duties, including taking custody, control and possession of all of the "Assets" (a defined term) of Innovative Wealth Builders.  Subsequently, on January 25, 2013, the Court entered a *Stipulated Preliminary Injunction* ("Preliminary Injunction") (Doc. No. 31) that, among other things, confirmed the Receiver's appointment, and renewed the direction that he take custody, control and possession of all of the Assets of the corporate defendant.  Preliminary Injunction, Section VIII.B., p. 15.

## II.   OPERATIVE FACTS

As discussed more fully in the *Receiver's Initial Report* (Doc. No. 26), the Receiver determined that the business of Innovative Wealth Builders involved telemarketing a financial "product" that was purported (i) to reduce consumers' interest rates on their credit cards, (ii) to save consumers thousands of dollars, and (iii) to assist consumers in getting out of debt quickly.

Customers who bought the "product" almost always paid by credit card.  To accept payments by credit card, Innovative Wealth Builders contracted with IRN, which functioned as a credit card processor, and First California Bank, the merchant account provider.  When a customer purchased Innovative Wealth Builders' "product," Innovative Wealth Builders, as the "merchant," would seek authorization from the customer's credit card issuer.  This authorization request, and the subsequent capture of the charge, was handled by the credit card processor, IRN. The funds were then deposited into a merchant account owned by Innovative Wealth Builders, and maintained with the merchant bank, First California Bank.

Theoretically, funds in a merchant account can be withdrawn by the merchant. However, if a customer successfully challenges a credit card payment posted to his or her credit card, then the merchant bank is obligated to refund the amount of the charge to the customer.[1] The merchant bank then must seek reimbursement from the merchant. To protect itself in high risk industries, such as telemarketing sales of debt payment products like that marketed by Innovative Wealth Builders, the merchant bank frequently will establish a "Reserve Account." This account typically is funded with a portion of the funds collected in the merchant account, with the amount being determined based upon the history of chargeback activity for the particular merchant. The merchant bank then claims a lien in those funds, to secure the merchant's obligation to reimburse the merchant bank for any chargebacks that it pays.

In this case, the Receiver was informed by one of the attorneys for IRN that IRN was withholding 30 percent of each credit card transaction as a reserve. Even for a high risk industry like telemarketing, this is a remarkable percentage of holdback, and explains how IRN has managed to accumulate over $700,000 of Innovative Wealth Builders' funds in a reserve account.[2]

The Receiver provided a copy of the TRO to counsel for IRN and made demand that IRN make arrangements for all funds it is holding on reserve to be forwarded to the Receiver. The Receiver then followed up with a demand letter to counsel for IRN on January 23, 2013. The Receiver informed IRN of the key provisions of the Court's TRO that are applicable to IRN as

---

[1]     If there is a credit card processor involved, then the obligation to refund payments to customers usually is contractually assumed by the credit card processor.

[2]     According to the Affidavit of James F. Marchese, Executive Vice President of IRN, as of the date that it received actual notice of the TRO, IRN was holding $703,631.87 of Innovative Wealth Builders' funds in its reserve account. *See* Affidavit of James F. Marchese, Exhibit "A" (hereinafter the "Marchese Affidavit").

{25786059;1}                                    4

IRN is holding Receivership Assets.   Specifically, the Court's TRO broadly orders the freeze of all assets of the Defendants and all entities affiliated with the Defendants, or agents of the Defendants, including specifically credit card processing companies such as IRN.   Section II of the Court's TRO is an "Asset Freeze" section that provides, in pertinent part:

> **IT IS FURTHER ORDERED** that Defendants, and their officers, agents, directors, servants, employees, salespersons, independent contractors, members, partners, corporations, subsidiaries, affiliates, successors and assigns, and all other Persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise . . . are hereby restrained and enjoined from:
>
> > **A.**    Transferring, liquidating, converting, encumbering, pledging, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, automobiles, accounts, contracts, consumer lists, coins, precious metals, artwork, shares of stock, uncashed checks, or other Assets, or any interest therein, <u>wherever located</u>, including any Assets outside the territorial United States, that are:
> >
> > > 1.    Owned, controlled or held by, in whole or in part, for the benefit of, or subject to access by, or belonging to, any Defendant.
> > >
> > > 2.    in the actual or constructive possession of any Defendant, including but not limited to any Assets held for or by any Defendant in any account at any bank or savings and loan institution, <u>or any credit card processing agent or agent providing electronic fund transfer services or automated clearing house processing</u>, network transaction processor, bank debit processing agent, customer service agent, commercial mail receiving agency, or mail holding or forwarding company, or any credit union, retirement fund custodian, money market or mutual fund, storage company, trustee, or with any broker-dealer, escrow agent, title company, commodity trading company, precious metal dealer, or other Financial Institution or depository of any kind, either within or outside the territorial United States;
> > >
> > > 3.    held by an agent of any Defendant as a retainer for the agent's provision of services to any Defendant. . . .

*See* Section II, TRO (emphasis added).  The TRO specifically mentions the Defendant's credit card processing company, and agents of the Defendant, as being subject to the Court's Order.

In addition to the Asset Freeze, the TRO directs and authorizes the Receiver to take custody, control and possession of all Assets of the Receivership Defendant <u>wherever situated</u>. *See* Section VIII, Paragraph B of the TRO (emphasis added).   "Asset" is defined in the TRO as "any legal or equitable interest in, right to, or claim to, any real or personal property, including, but not limited to, 'goods,' 'instruments,' 'equipment,' 'fixtures,' 'general intangibles,' 'inventory,' 'checks,' or 'notes,' (as these terms are defined in the Uniform Commercial Code), lines of credit, chattels, leaseholds, contracts, mail or other deliveries, shares of stock, lists of consumer names, accounts, credits, premises, receivables, funds, and all cash, wherever located."   This is a broad definition, and is clearly intended to cover the reserve funds held by IRN.   The Receiver is also tasked with preventing the inequitable distribution of Assets, and determining and protecting the interests of consumers and creditors who have transacted business with the Receivership Defendant.  *See* Section VII, Paragraph F of the TRO.   Without the compliance of IRN, the Receiver is unable to prevent the inequitable distribution of receivership Assets, or fairly and equitably distribute the Assets amongst all injured consumers and other creditors who have transacted business with the Receivership Defendant.

On January 24, 2013, IRN provided the Receiver with a sworn statement from James F. Marchese, Executive Vice President of IRN.   Marchese states that the IRN reserve account held for Innovative Wealth Builders, with a balance of $703,631.87, would not be turned over. Marchese argued that the reserve account is a source for reimbursement for chargebacks – a "procedure by which a card transaction is returned as the result of a dispute by a cardholder." Marchese contends that because "IRN's possessory security interest in the reserve account predates the appointment of the receiver" the reserve account funds "are not subject to being turned over."  *See* Marchese Affidavit, Exhibit A.

Upon receipt of Marchese's Affidavit, the undersigned counsel made demand for the immediate payment of the merchant account and reserve account funds.[3]  On February 4, 2013, counsel for IRN indicated that IRN would not turn over the full balance of $703,631.87 to the Receiver.  On February 5, 2013, IRN, a non-party in this case, filed *a Motion for Modification of Stipulated Preliminary Injunction and Supporting Memorandum of Law* (Doc. No. 33) (the "Motion to Modify the Preliminary Injunction").[4]  The Receiver filed this Motion for Order to Show Cause for why IRN should not be held in contempt of Court for its refusal to comply with this Court's Orders.

### III.   LEGAL STANDARD

The power of contempt is an inherent element of the judicial function. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 43-44 (1991).  To support a finding of civil contempt, a Court need only find that there was a failure to comply with an existing court order, which order required or prohibited specific conduct.  *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525 (11th Cir. 1992).   A court should impose sanctions to ensure that the court's orders are followed, including fines, attorneys' fees and costs.  Here, there is no dispute that IRN knew that the TRO and the Preliminary Injunction both require it to turn over all receivership Assets to the Receiver, nor is there any dispute that IRN has intentionally refused to do so.

### IV.   LEGAL ANALYSIS AND ARGUMENT

The Court's TRO and Preliminary Injunction both enjoin all persons who receive copies of those orders from disposing of any Assets of the receivership defendant, or from interfering

---

[3]      The Receiver's repeated demands for the reserve account funds are attached hereto as Composite Exhibit "B."

[4]      As a non-party, IRN lacks standing to seek any relief in this case.  Its motion accordingly should be stricken. *See FTC's Motion to Strike IRN's Motion.* (Doc. 35).

with the Receiver's efforts to obtain possession, custody or control of receivership Assets. Indeed, the TRO and Preliminary Injunction impose an affirmative duty on all such persons to cooperate with the Receiver and to refrain from failing to provide assistance to the Receiver in connection with obtaining possession of such Assets. Rather than comply with the clear directions of the TRO and Preliminary Injunction, IRN has engaged in a pattern of conduct designed to frustrate the Receiver's efforts to fulfill his duties. Such conduct is unacceptable, and should result in contempt sanctions.

IRN contends that it does not have to comply with the Court's Orders because of its interpretation of certain provisions in its Card Service Agreement with Independent Wealth Builders. However, the Card Service Agreement is at best inconsistent, because despite IRN's arguments it also provides that Innovative Wealth Services grants a security interest in the reserve account to IRN. Under New York law, to create an enforceable security interest, Innovative Wealth Services must own the collateral – it must own the reserve account. Since IRN drafted the Card Service Agreement, any ambiguities in the agreement should be construed against the drafter – IRN. Regardless of how the Court views these contractual arguments, as more fully set forth below, federal courts that have considered this identical dispute in previous cases between the FTC and other credit card servicers have ruled in favor of the FTC. Courts recognize the sound policy reasons behind the Receiver's position – most obviously, that allowing credit card processing companies to keep all the money they have collected on behalf of the receivership defendant would thwart the very purpose of the receivership.

A.     **IRN is subject to jurisdiction in this Court.**

In its Motion to Modify the Preliminary Injunction, IRN argues that the Receiver has been divested of jurisdiction over the funds in the reserve account because, it argues, the

Receiver did not timely comply with 28 U.S.C. §754.  Under that statute, a receiver appointed in any civil action or proceeding involving property shall "be vested with complete jurisdiction and control of all such property with the right to take possession thereof."  The statute provides that receiver shall, within ten days after entry of his order of appointment, "file copies of the complaint and such order of appointment in the district court for each district in which property is located."  *Id.*

On February 6, 2013, the Receiver filed the Complaint and Order of Appointment in both the United States District Court for the Eastern District of New York, where IRN is headquartered, and the United States District Court for the Central District of California, where First California Bank is located.  Copies of the Receiver's Notice of Filings are attached as Exhibit "C."  Of course, the Receiver is not really sure where the specific reserve funds are "located," as money is fungible.  But in making these filings, the Receiver substantially complied with the requirements of  § 754.

That the Receiver did not file the Complaint and Order of Appointment in the foreign federal courts within ten days of his appointment is of no consequence.  Federal courts have routinely held that § 754 should be interpreted and applied flexibly.  For instance, in *SEC v. Equity Serv. Corp.*, 632 F.2d 1092 (3rd Cir. 1980), the Third Circuit Court of Appeals noted that the purpose of the statute is "to permit a receiver who has failed to file within the ten-day period to reassume jurisdiction by a later filing, as long as the rights of others have not been prejudiced during the intervening period."  *Equity Service Corp.*, 632 F.2d at 1095.   The Court noted that the purpose of the statute is to provide notice that certain property is within the jurisdiction of a foreign federal receiver.  *Id.*  Here, the Receiver immediately put IRN on notice of that the property IRN was holding was within the Receiver's jurisdiction through the Receiver's demands

on IRN as detailed above, and through the undersigned's communications with IRN's counsel regarding the Receiver's demands.  IRN can make no showing that it was prejudiced by the timing of the Receiver's filings.  The Receiver substantially complied with the requirements of § 754, and can assert jurisdiction over the receivership Assets held by IRN.

IRN also is subject to personal jurisdiction in this Court concerning this dispute under a classic minimum contacts analysis.  As the United States Supreme Court has recognized, when a party reaches out beyond one state and creates "continuing obligations" between itself and residents of the forum, and has "purposefully directed" its activities toward residents of another State, jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State."  *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985).   In this case, IRN sought out and entered into a Card Service Agreement with Innovative Wealth Builders, a Florida entity, entering into an ongoing arrangement to collect funds on behalf of Innovative Wealth Builders.  The Receiver has discovered daily correspondence and communications between IRN and Innovative Wealth Builders, extending back for over three years.  IRN engaged in the kind of continuing commercial relationship that satisfies the minimum contact analysis as provided for by the United States Supreme Court's jurisdictional case law.  Thus, the Receiver has not lost jurisdiction over the reserve funds, and in any event, IRN is subject to the jurisdiction of this court.

**B.**    **IRN has no independent claim to ownership of the funds at issue, and this Court has broad equitable powers to see that the purposes of receiverships initiated by a federal agency are carried out.**

IRN has no independent claim to ownership of the funds in the reserve account.  IRN collected those funds only to the extent that it was acting on behalf of Innovative Wealth Builders, which sold its financial services "product" to customers in return for credit card

payments.  IRN asserts that it is the "owner" of these funds under its Card Services Agreement, and therefore IRN may sit on these funds and deplete them so that it can process any chargebacks that may arise in the coming months.  But federal courts in FTC receivership cases have rejected this same argument before, recognizing that allowing credit card processing companies to retain all of the funds they collect on behalf of the receivership entity would thwart the very purpose of the receivership.

In *FTC v. Productive Marketing Inc.,* 136 F. Supp. 1096 (C.D. Cal. 2001), the FTC moved for an Order finding nonparty American Credit Card Processing Corporation ("ACCPC") in contempt for failure to comply with the Court's preliminary injunction order.  *Productive Marketing*, 136 F. Supp. at 1100.   The Defendants had contracted with ACCPC, an independent sales organization ("ISO") in New York that is in the business of brokering agreements between credit card processors and merchants for the purposes of facilitating consumer credit card transactions.   ACCPC, in turn, contracted with Equifax Payment Services, to process these credit card transactions.  *Id.*  Equifax withheld a "reserve" equal to ten percent of the credit card charges processed "to cover chargebacks by merchants or refund requests by consumers, and forwarded that amount to ACCPC."   *Id.*  Equifax then deposited the remainder in the bank accounts of the Defendants, and deducted its fee from the total funds paid to ACCPC at the end of each month.   *Id.*   Despite the Receiver's demands, ACCPC refused to turn over the reserve accounts.  *Id.*

In considering the FTC's Motion for Contempt, the Court first determined that it had personal jurisdiction over ACCPC.  *Id.* at 1102.[5]   The Court recognized that federal courts

---

[5]     The Court reasoned that ACCPC entered into a contract to process consumer credit card charges with the Defendants, California corporations, and that by executing this agreement, ACCPC had "purposefully availed itself of the protections of California law."  *Id.*  Applying the

possess broad authority "to issue a variety of 'ancillary relief' measures in [enforcement] actions brought by federal agencies." *Id.* The Court relied on the decision in *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980), which recognized the "broad equitable powers of federal courts to shape equitable remedies to the necessities of particular cases, especially where a federal agency seeks enforcement in the public interest."   The *Productive Marketing* Court determined that permitting ACCPC to hold the reserve funds that are properly part of the receivership estate would severely hinder the receiver's ability to carry out the purpose of the receivership.   The Court also was concerned that the FTC would need to institute a separate action against ACCPC, a third party, that "would result in a multiplicity of actions in different forums, and would increase litigation costs for all parties while diminishing the size of the receivership estate." *FTC v. Productive Marketing*, 136 F. Supp. 2d at 1106 (citing *SEC v. Universal Financial*, 760 F.2d 1034, 1038 (9th Cir. 1985)).   For these reasons, the Court held that ACCPC failed to comply with the Court's Preliminary Injunction Order, and found that contempt sanctions against ACCPC were warranted. *Id.* at 1111.

For these same reasons, the Receiver moves this Court for Order to Show Cause as to why IRN should not be held in Contempt of Court for its failure to turn over receivership Assets. IRN is merely collecting these credit card charges for Innovative Wealth Builders, much like ACCPC and Equifax did for Productive Marketing.  In light of the substantial harm to the public that prompted the FTC to initiate this action, this Court should use its broad equitable powers to fashion a remedy that makes certain the public's interest is upheld by making sure all

---

Ninth Circuit's test for personal jurisdiction, the Court found that ACCPC had completed "thousands of transactions" involving California residents, and that "[b]ut for ACCPC's agreement to process credit card transactions for the receivership defendants and its deduction of reserves from consumer credit card charges to fund chargebacks, ACCPC would not be holding any assets of receivership estate, and the FTC would have no reason to move for a contempt order." *Productive Marketing*, 136 F. Supp. at 1102.

receivership assets are collected. *Wencke*, 622 F.2d at 1371. In addition, the Court has the authority to use its equitable powers to ensure that judicial resources are used in an efficient way. To exempt IRN, a third party, from the Court's TRO would create a precedent that could require federal agencies to have to litigate these issues piecemeal - in multiple actions, in multiple forms - ultimately diminishing the size of receivership assets available for injured consumers. *See SEC v. Universal Financial*, 760 F.2d 1034, 1038 (9th Cir. 1985).

The United States District Court for the Eastern District of Pennsylvania also considered this identical issue in *FTC v. NHS Systems*, 708 F. Supp. 2d 456 (E.D. Pa. 1999). The defendants in that case sold health benefit plans by employing telemarketers. Teledraft processed payments for the health plan providers. The Court found that Teledraft was a "middleman between the customer and the health care provider." *Id.* at 459. Teledraft processed remote checks and Automated Clearing House transfers. Although Teledraft was not a defendant or party to the FTC litigation, the Court found that it was bound by the Court's TRO, which applied to freeze assets of the Receivership.

The Court first found that it has *in rem* jurisdiction over Receivership funds pursuant to 28 U.S.C. § 754, which sets out a receiver's nationwide jurisdiction over receivership property. *Id.* at 463. Even though the Receiver was late in filing its required documents in the Western District of New York, the Court noted that Teledraft had made no showing that it was prejudiced by the timing of the Receiver's filing, and the Receiver's late filing did not divest the Court of *in rem* jurisdiction. *Id.* at 463. As to the heart of Teledraft's argument – that it holds a "contractual right to withhold funds in a variety of circumstances" – the Court rejected it, noting that "it defies common sense that funds collected by Teledraft – which is essentially nothing more than a middleman – for the Receivership should be considered the property of Teledraft."

*Id.* at 464-465.   The Court distinguished the cases cited by Teledraft, as none of them directly address a situation involving "a bank or other similar financial institution that holds funds on behalf of a receivership entity." *Id.* at 465 n.10.   The Court ordered Teledraft to turn over to the Receiver the funds the Receiver has requested.   *Id.* at 471.

In its decision, the *NHS Systems* Court relied on *U.S. v. Payment Processing Center*, 461 F.Supp.2d. 319 (E.D. Pa. 2006), where the Court considered a claim by a third-party bank, Wachovia, that it had contractual rights to funds held on behalf of the defendant, whose funds had been frozen by a previous order.   The Court found that although there was a financial services contract to create contractual chargeback rights, that "contractual claim did not alter the fact that the funds held by Wachovia were in fact Receivership property." *FTC v. NHS Systems,* 708 F. Supp. 2d 456 (E.D. Pa. 1999), *citing United States v. Payment Processing Center*, 461 F. Supp. 2d at 321.   Similarly in this case, the mere fact that IRN may have a contractual claim under the Card Service Agreement does <u>not</u> change the fact that the funds held by IRN are in fact Receivership property, and should have been turned over to the Receiver upon IRN's receipt of this Court's TRO.

> **C.    IRN's proposal to modify the Preliminary Injunction, instead of turning over the reserve account to the Receiver, would thwart the purposes of the Receivership, which is to immediately and fairly distribute receivership assets to injured consumers.**

In its Motion for Modification of the Stipulated Preliminary Injunction, IRN argues that the chargeback process "is the most efficient ways for the consumers to obtain these monies." IRN proposes that it merely report back to the Receiver and the Court on chargeback claims made by customers of Innovative Wealth Builders and make payments on accounts of such chargebacks "in the ordinary course of IRN's operations."   *See* IRN's Motion for Modification of Stipulated Preliminary Injunction (Doc. 33).   But there is nothing ordinary about what happened

at Innovative Wealth Builders that led the FTC to initiate this action.   Indeed the FTC's Motion for a TRO calls for immediate relief so that all injured consumers can be made whole – not merely those who may have recently sought a chargeback through IRN.

IRN in its Motion relies on *FTC v. Transcontinental Warranty, Inc.,* 2009 WL 5166213 (N.D. Ill. Dec. 22, 2009).   But that case is distinguishable.   In that case, Transcontinental contracted to sell "vehicle service contracts" to purchasers payable by the purchaser in installments.   Mepco serviced the payment plans, while retaining a fee for itself.   However, unlike in this case, the Receiver in Transcontinental was not claiming property held by Mepco in Transcontinental's name.   The Receiver was asserting in its Motion a disputed right to payment under a Dealer Agreement, after Mepco cancelled a payment due to Transcontinental.   *Id.* at *2. In this case, IRN has not cancelled payments due to Innovative Wealth Builders;  rather, IRN claims that it is entitled by contract to keep the entire amount of the reserve account in its possession, despite the Court's TRO.   Whatever contractual rights IRN may have do not trump the Receiver's authority pursuant to the Court's TRO to immediately collect receivership assets. *See  FTC v. NHS Systems,* 708 F. Supp. 2d 456 (E.D. Pa. 2009).

This Court has the authority to order a non-party like IRN to turn over funds without plenary proceedings.   In a series of opinions, the Ninth Circuit has noted that "the traditional rule is that summary proceedings are appropriate and proper to protect equity receivership assets" *United States v. Arizona Fuels,* 739 F.2d 455, 458 (9th Cir. 1984) *see also SEC v. American Capital Investments, Inc.*, 98 F.3d 1133, 1146 (9th Cir. 1996)*, abrogated on other grounds by Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83,93-94 (1998) ("For the claims of nonparties to property claimed by receivers, summary proceedings satisfy due process so long as there is adequate notice and opportunity to be heard").

Granting the Receiver's Motion for Order to Show Cause, and ordering the reserve funds turned over to the Receiver, does not resolve IRN's contractual claims against the Receivership entity. *See, e.g., FTC v. NHS Systems,* 708 F. Supp. 2d 456, 467 (E.D. Pa. 2009). It merely allows possession of these funds so they can be appropriately distributed by the Receiver. The Receiver, at the Court's direction, should be able to broadly and fairly fashion an equitable remedy taking into account all factors and all injured consumers and claimants, and with all the Receivership assets available to him in this process.

IRN should be treated like any other claimant, and the Receiver will certainly take whatever claim IRN may file with the Receiver under consideration. But the Receiver should be able to broadly and equitably administer the Receivership fund amongst all injured consumers and claimants, using all of the Receivership Assets available. IRN's efforts to avoid this process should not be permitted by this Court, and in fact, in light of this Court's prior orders, this Court should conclude that IRN's refusal to comply with this Court's orders is sanctionable conduct.

**D.    The Card Service Agreement, as governed by New York's Uniform Commercial Code, provides that Innovative Wealth Services is the owner of the reserve account.**

In its efforts to avoid turning over receivership Assets, IRN relies extensively on various provisions of its Card Services Agreement with Innovative Wealth Services. The Card Services Agreement between IRN and Innovative Wealth Services provides that "[Innovative Wealth Services] hereby grants a security interest in the Operating Account, Reserve Account and/or any substitute accounts now and in the future and all proceeds thereof to Member and IRN to secure all fees, costs and charges due in accordance with this Agreement." See *Card Service Agreement,* attached hereto as Exhibit "D." If IRN does have a security interest in Innovative Wealth Builder's reserve account, as expressly stated in the Card Services Agreement, then under

basic principles of the law of Article 9 of the Uniform Commercial Code Innovative Wealth Builders is the owner of the reserve account.

The rules for the creation of security interests under Article 9 are fairly straightforward. In order to create a security interest enforceable against the debtor, there are three requirements set forth in the New York Uniform Commercial Code.[6]   One of the requirements for a security interest to be enforceable against a debtor and third parties with respect to collateral is that "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party." N.Y. U.C.C. § 9-203(b)(2) (2013).   Innovative Wealth Services – having granted a secured interest in the account pursuant to the Card Service Agreement – has a right to the collateral under New York law.   Indeed, Innovative Wealth Services is the owner of that collateral.

This Court should determine that the Receiver has the authority pursuant to the Court's TRO to take possession of the Reserve Account, and that IRN has no contractual right to withhold the funds.  However, even if the Court accepts that IRN has a contractual right to be paid chargebacks from the reserve account, the Card Service Agreement that IRN relies on makes clear that Innovative Wealth Services owns the reserve account – as it must in order to be able to grant a security interest in its collateral.

---

[6]     The Card Service Agreement has a choice of law agreement which provides that disputes arising out of the Card Services Agreement shall be governed by the laws of the State of New York. *See* Card Services Agreement, Paragraph 17, Exhibit "D."

## V.   **RELIEF SOUGHT BY THE RECEIVER**

In light of IRN's refusal to comply with the Receiver's demands, the Receiver respectfully requests that this Court order:

(1)   IRN to fully account for and immediately turn over to the Receiver the $703,631.87 it is holding in the Innovative Wealth Builders reserve account; and

(2)   IRN pay for the Receiver's attorneys' fees and costs in bringing this Motion for Order to Show Cause, presently estimated at approximately $17,500.00; and

(3)   IRN be enjoined from further violation of the Court's TRO and Preliminary Injunction.

### Local Rule 3.01(g) Certification

The undersigned certifies that he has conferred with counsel for IRN in a good faith effort to resolve the issues raised by this Motion.  The parties were unable to reach an agreement.

WHEREFORE, the Receiver respectfully requests that the Court enter an Order directed IRN to show cause as to why it should not be held in contempt of Court for its actions as outlined above.

By: /s/ Mark J. Bernet, Receiver
Mark J. Bernet


401 E. Jackson Street, Suite 1700
Tampa, FL  33602-5250
Telephone:  (813) 223-7333
Facsimile:  (813) 223-2837
Email: Mark.Bernet@akerman.com

By:  /s/ Benjamin F. Diamond
Benjamin F. Diamond
Florida Bar No. 899291
**AKERMAN SENTERFITT**
401 E. Jackson Street, Suite 1700
Tampa, FL  33602-5250
Telephone:  (813) 223-7333
Facsimile:  (813) 223-2387
E-Mail: Benjamin.Diamond@akerman.com
Secondary e-mail:
Sharon.Wells@akerman.com

*Attorney for Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served by CM/ECF to the

following this 7th day of February, 2013:

Richard T. Heiden, Esquire
2723 State Road 580
Clearwater, Florida 33761
richardheiden@rthlaw.com

Valerie M. Verduce, Esquire
225 Peachtree Street, N.E., Suite 1500
Atlanta, Georgia 30303
vverduce@ftc.gov

Todd Foster, Esquire
Christina Kimball Walker
Todd Foster Law Group
1881 W. Kennedy Blvd.
Tampa, FL 33606
tfoster@tfosterlaw.com
ckimball@tfosterlaw.com

S. Spencer Elg, Esquire
225 Peachtree Street, N.E., Suite 1500
Atlanta, Georgia 30303
selg@ftc.gov

David J. Lienhart, Esquire
Roetzel & Andress
P. O. Box 6507
Orlando, Florida 32802-2224
dlienhart@ralaw.com

/s/ Benjamin F. Diamond
Attorney

{25786059;1}
19