# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Civ No. 8:13-cv-123-T-33EAJ |
| | ) |
| v. | ) **FIRST AMENDED COMPLAINT** |
| | ) **FOR PERMANENT INJUNCTION** |
| INNOVATIVE WEALTH BUILDERS, INC.; | ) **AND OTHER EQUITABLE RELIEF** |
| CARLY JANENE PELLAND, a/k/a | ) |
| CARLY ZURITA; TAMARA DAWN JOHNSON; | ) |
| SHERYL LEIGH LOPEZ; and INDEPENDANT | ) |
| RESOURCES NETWORK CORP. also d/b/a IRN | ) |
| PAYMENT SYSTEMS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b).

1

3.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c) and 6105(b).

## DEFENDANTS

6.      Innovative Wealth Builders, Inc. ("IWB") is a Florida corporation with its principal place of business at 28059 US Hwy 19 North, Suite 300, Clearwater, FL 33761. IWB transacts or has transacted business in this district and throughout the United States.

7.      Carly Janene Pelland, a/k/a Carly Zurita, is the President and an owner of IWB. At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Pelland resides in this district and, in connection with the

matters alleged herein, transacts or has transacted business in this district and throughout the United States.

8.     Sheryl Leigh Lopez is a Vice President and an owner of IWB.  At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Lopez resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

9.     Tamara Dawn Johnson is a Vice President and an owner of IWB.  At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Johnson resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

10.     Independant Resources Network Corp. also d/b/a IRN Payment Systems ("IRN") is a New York corporation with its principal place of business at 800 Shames Drive, Westbury, NY 11590.  IRN transacts or has transacted business in this district and throughout the United States.  From at least August 2009 through January 2013, acting alone or in concert with others, IRN provided credit card processing services to IWB.

## COMMERCE

11.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE IWB DEFENDANTS' BUSINESS PRACTICES

12.     Since at least 2009 until enjoined by court order in January 2013, Defendants IWB; Carly Janene Pelland, a/k/a Carly Zurita; Sheryl Leigh Lopez; and Tamara Dawn Johnson (collectively, the "IWB Defendants") engaged in deceptive telemarketing campaigns throughout the United States designed to take money from already indebted consumers.

13.     The IWB Defendants cold called consumers and claimed that the IWB Defendants would reduce substantially the interest rates of consumers' credit cards, save them thousands of dollars, and help them pay off their debts much faster.  The IWB Defendants then typically informed consumers they had to pay a "one-time lifetime fee" generally ranging from $500-$2,000 to secure the deal.

14.     Despite the IWB Defendants' promises, consumers did not receive lower interest rates, save thousands of dollars or pay off their debts faster as a result of the IWB Defendants' "service."

**A.     The Pitch**

15.     The IWB Defendants typically began their calls with an alluring pitch.  The IWB Defendants told consumers that IWB was a company that could reduce consumers' existing credit card interest rates and save consumers thousands of dollars in a short period of time.

16.     The IWB Defendants told consumers that the IWB Defendants had been in business for many years and had developed close working relationships with tens of thousands of different lending institutions.  The IWB Defendants said that these relationships gave them superior bargaining power, allowing them to negotiate reduced credit card interest rates far better and more effectively than consumers could do for themselves.  The IWB Defendants said that

they had a proven record of success and that consumers could put their trust in IWB to help them reduce their credit card interest rates.

17.     The IWB Defendants typically told consumers that consumers would be able to pay off their debts "twice as fast" or "in half the time" without having to increase their monthly payments.

18.     Without obtaining any detailed financial information from consumers, the IWB Defendants then "guaranteed" consumers a specific minimum dollar amount in savings.

19.     The specific amount of savings guaranteed by the IWB Defendants typically ranged between $1,500 and $5,000.  For example, in an telephone recording with a consumer, the IWB Defendants' telemarketer stated:

> . . . we only have approximately 30 days to get the interest as low as possible and also show to you in black and white the guaranteed savings of 2,500 . . . just on this one account, ma'am, you're going to save about $2,500 to $3,000 in interest just on this one card. Plus, it's going to cut years off your payments.  I can assure you, ma'am, we have over 15 years of experience for a reason, ma'am.

20.     Similarly, in a telemarketing script used by the IWB Defendants, the IWB Defendants instructed their  telemarketers to stress the "guaranteed" savings by saying:

> we will guarantee to show you a minimum savings of $3,000/$1,500 interest;

> we will show you a minimum savings of $3,000/$1,500 in interest; and

> I am sure you already know what you could do with these kinds of savings.

21.     Once consumers were assured that they were "guaranteed" to receive thousands of dollars in savings, the IWB Defendants then told consumers they would be charged a "one-time, lifetime fee."

22.     The fee quoted by the IWB Defendants typically ranged between $500 and $2,000, and the amount a given consumer was charged appears to be largely based on the consumer's reluctance or ability to pay.

23.     In many instances, the IWB Defendants told consumers that there was really no "out of pocket cost" or that the fee would be "offset" or "absorbed" by the thousands of dollars in guaranteed, promised savings.

24.     Consumers were further assured that there was "no risk" to them because the IWB Defendants guaranteed consumers a full refund if the IWB Defendants failed to save consumers the minimum amount that had been promised within a very short period of time, usually within thirty days.

**B.     The Verification**

25.     Consumers were then typically transferred to a second representative who sought to obtain a recorded verification of the consumers' agreements to be charged.

26.     During the recorded verification portion of the calls, the IWB Defendants also attempted to qualify some of the guarantees made in the initial pitch by saying they could not promise consumers how low their rates would go "today."   However, the IWB Defendants continued to promise consumers that consumers would save a specific minimum amount of savings on their credit card debts and would be able to pay off their debts much faster.

27.     Consumers who asked questions during the verification were quickly transferred back to the original telemarketers who reassured the consumers with the same false promises as before.  For example, in a recorded conversation with a consumer, the IWB Defendants' telemarketer stated:

> And like I said, ma'am, you qualified today for no out-of-pocket
> expense, so you don't have to mail us in a check or a money order

6

for the 895, just maintain your payments to your credit card, just like you always do, because we only have approximately 30 days to get the interest as low as possible and also show to you in black and white that guaranteed savings of 2,500.  I mean, obviously, ma'am, 2,500 is much greater than just 895, right? . . . And, Wilma, if we cannot save you 2,500, ma'am, then the 895, it gets credited back to your card in full, no questions asked.

### C.    What Consumers Actually Received

28.    Consumers were almost immediately charged a fee ranging anywhere from $500-$2,000.  The IWB Defendants charged thousands of consumers, and the total charges were millions of dollars.  In return, consumers did not receive what they were promised.

29.    Instead, after the sales call, consumers may have received a "welcome packet" with forms for the consumers to fill out and return.  The forms requested consumers' personal information and credit card information.

30.    Once consumers filled out the forms and sent them back, the IWB Defendants may have sent a document they called a "financial plan."

31.    The IWB Defendants' "financial plan" included little more than a comparison between (i) the total amount consumers would pay on their debts if they only paid the minimum monthly amount and (ii) the total amount consumers would pay on their debts if they paid some amount greater than their monthly minimum payment.

32.    Further, in numerous instances, consumers were not provided full refunds when the IWB Defendants failed to fulfill their promises.  Instead, the IWB Defendants either flatly refused to refund consumers their money or waylaid consumers with additional false promises that their refunds were being processed and would post "within 2-3 billing cycles."  Consumers were left saddled with even greater debts than before due to fees that the IWB Defendants charged consumers.

7

33.     A significant portion of the IWB Defendants' business was devoted to challenging credit card disputes initiated by dissatisfied consumers.  With the assistance of IRN, the IWB Defendants vigorously contested credit card disputes initiated by dissatisfied consumers.

34.     In numerous instances, after the IWB Defendants charged consumers an initial fee, the IWB Defendants made additional charges for hundreds of dollars to consumers' credit cards without consumers' express informed consent.

## IRN'S BUSINESS PRACTICES

### A.     Credit Card Processing and Chargebacks Generally

35.     In order to accept credit card payments from consumers, a merchant must establish a merchant account with a merchant bank (also referred to as an "acquiring bank").

36.     Merchant banks are members of the credit card associations, such as MasterCard and Visa, and frequently enter into contracts with payment processors that manage the bank's merchant processing program.

37.     A merchant account is used to transmit credit card transaction data and allocate or settle funds between merchants and consumers.

38.     A merchant may establish a merchant account directly with a merchant bank.  In most cases, however, a merchant will establish a merchant account with a merchant bank through a payment processor.

39.     Payment processors, such as IRN, are entities that process credit or debit card transactions between merchants and consumers.

40.     When a merchant obtains a merchant account through a payment processor, it typically enters into a merchant processing agreement with a merchant bank and the payment processor.

41.     Before entering into a credit card processing agreement with a merchant, payment processors typically perform an underwriting of the account to determine the merchant's risk profile.

42.     Consumers have the ability to dispute charges that appear on their credit bills through a process that is known as the "chargeback" process.

43.     The chargeback process is intended to protect consumers from fraud and unauthorized charges on their credit card bills.

44.     A consumer initiates the chargeback process by contacting her credit card issuing bank to dispute a charge appearing on her credit card account statement.

45.     A consumer's right to initiate a credit card chargeback is governed by her cardholder agreement, the rules of the credit card associations, and Regulation Z of the Truth in Lending Act, 15 U.S.C. §§ 1601-1616.

46.     When a consumer successfully disputes a charge through the chargeback process, the consumer's issuing bank credits the consumer's credit card for the amount of the disputed charge.  The issuing bank, in turn, recovers the amount of the chargeback from the merchant bank, which typically collects that amount from the payment processor.  The payment processor then typically collects the amount of the chargeback from the merchant.

47.     Credit card associations - such as Visa and MasterCard - have rules regarding the chargeback process.  Those rules provide that merchants may dispute an attempted chargeback by arguing that the charge was, in fact, valid.  If the merchant disputes the attempted chargeback,

the credit card association rules govern the manner in which the dispute is resolved.  If the merchant is successful in disputing the chargeback, the issuing bank reverses any provisional credit issued to the consumer and the consumer becomes financially responsible for the disputed charge.  When a consumer's chargeback is successful, the disputed charge is removed from the consumer's account or an offsetting credit is issued.

48.    Each chargeback receives a chargeback reason code that describes the nature of the dispute, such as "services not rendered" or "fraudulent transaction-card absent environment."

**B.    IRN Processed for IWB Despite Alarmingly High Chargeback Rates**

49.    IRN began processing credit card transactions for IWB in August 2009 and continued to process payments for IWB until IWB was enjoined by court order in January 2013.

50.    The average chargeback rate (the percentage of transactions resulting in chargebacks) for credit card transactions in the United States is below 1%.

51.    The average chargeback rate for clients of IRN is below 1%.

52.    In the first month of IRN's processing for IWB–August 2009– IWB's chargeback rate exceeded 1%.

53.    For the months of September 2009 through December 2009, IWB's chargeback rates exceeded 3% and were as high as 11%.

54.    For each month from January 2010 to January 2013, IWB's chargeback rate exceeded 10%.

55.    For the time period between January 2010 and January 2013, IWB's average chargeback rate exceeded 20%.

56.    For the time period between August 2009 and January 2013, IWB's monthly chargeback rate exceeded 40% multiple times.

57.     IRN assisted IWB in attempting to find a new processor for IWB.  Despite IRN's efforts in assisting IWB to find a new processor, other processors were unwilling to take IWB with its high chargeback rates.

**C.     IRN Knew, or Consciously Avoided Knowing, Key Facts About The IWB Defendants' Business**

58.     At the time IRN began processing for IWB, and throughout the time that IRN processed for IWB, IRN knew, or consciously avoided knowing, that IWB was a telemarketing company.

59.     For example, IWB's merchant application with IRN stated that 100% of the credit card transactions IWB was going to submit to IRN for processing would be "MOTO" (*i.e.*, "mail order, telephone order") transactions.

60.     At the time IRN began processing for IWB, and throughout the time that IRN processed for IWB, IRN knew, or consciously avoided knowing, that IWB was selling debt relief services.

61.     For example, before it began processing for IWB, IRN reviewed IWB's website, which stated that IWB was offering a program to reduce consumers' debt obligations, enhance their credit, save money on their interest payments, and get them out of debt in half the time.

62.     At various times during which IRN processed for IWB, IWB sent IRN copies of company documents including, but not limited to, telemarketing scripts and samples of the IWB Defendants' "financial plan."

63.     Throughout the time period that IRN processed for IWB, IRN knew, or consciously avoided knowing, that IWB was collecting an up-front fee for its services.

64.     At the time IRN began processing for IWB, IRN was aware that IWB had a variety of complaints on consumer websites.

11

65.     At the time IRN began processing for IWB, IRN was aware that IWB had an "F"

rating with Better Business Bureau of West Florida, Inc. ("BBB").

66.     Since at least 2010, BBB's website, which IRN accessed at various times, has

stated that:

> BBB has received a pattern of complaints [against IWB]
> concerning misrepresentation in selling practices, failure to honor
> promised refunds in a timely manner and failure to issue refunds
> after being told that a refund would be issued.

67.     Throughout the time period that IRN processed for IWB, IRN received thousands

of copies of chargeback disputes initiated by dissatisfied consumers.

68.     In numerous chargeback disputes received by IRN, consumers stated that IWB

had not reduced their credit interest rates, saved them money on their credit card debts, or helped

them pay off their debts faster.

69.     In numerous chargeback disputes received by IRN, consumers stated that IWB

made unauthorized charges to their credit cards.

70.     In November 2010, IRN was aware that IWB was the subject of an investigation

by the Florida Attorney General's Office that was carried out pursuant to Florida's Deceptive

and Unfair Trade Practices Act.

71.     IRN was aware since at least November 2010 that MasterCard identified IWB as

being in the highest fraud category—"tier 3" or "high fraud alert"—under MasterCard's fraud

control program because of IWB's number of fraudulent transactions, volume of fraudulent

transactions, and ratio of fraud-to-dollar sales.

72.     IRN received multiple fraud alerts from Discover regarding IWB.

73.     In July 2012, IRN was aware that the IWB Defendants were the subject of an investigation by the FTC to determine whether they had engaged or were engaging in deceptive or unfair acts or practices in the advertising, marketing, or sale of debt relief services.

74.     Rather than cease processing for the IWB Defendants after the illegal nature of their business was apparent, IRN chose to continue profiting from processing IWB's credit card transactions.

75.     Although IRN did not cease processing for the IWB Defendants, it did respond to the numerous indicators of the illegal nature of their business by seeking to protect its own interests.  Specifically, IRN increased the percentage it withheld from transactions processed for IWB, which IRN held in a reserve account.  IRN intended for the funds in the reserve account to compensate IRN for chargebacks and other potential liabilities.  The amount held by IRN in the reserve account was nearly $700,000 at the time Plaintiff filed the instant action.

**D.     IRN Provided Substantial Assistance to IWB, Resulting in Millions of Dollars of Consumer Harm and Thousands of Injured Consumers**

76.     IRN's processing services permitted the IWB Defendants to access the credit card networks and charge millions of dollars of fees to the credit cards of consumers who purchased the IWB Defendants' "services."

77.     During the time period that IRN processed for IWB, IRN assisted IWB in challenging chargeback disputes.

78.     IRN reviewed IWB's responses to chargeback disputes and made recommendations on how to defeat chargeback requests.

79.     IRN assisted IWB in implementing a policy of obtaining signed proofs of delivery for documents sent to consumers after IWB charged them.  The proofs of delivery were used to defeat chargeback requests by claiming that consumers received unreturned merchandise.  IRN

provided this assistance despite knowing that IWB was selling debt relief services, not merchandise.

80.     IRN assisted IWB by instructing IWB to structure sales transactions such that an initial charge of a relatively small percentage of the overall fee was made prior to a subsequent charge for the remainder of the overall fee.

81.     In 2011, IRN further assisted IWB by entering into an agreement, similar to a line of credit, whereby IRN would advance cash to IWB with repayment to be made from future money processed by IRN for IWB.

82.     IRN made numerous cash advances to IWB.

83.     The cash advances made by IRN to IWB totaled hundreds of thousands of dollars.

**E.      IRN profited from the IWB Defendants' Wrongful Acts**

84.     In exchange for IRN's processing services, IWB paid IRN a percentage of each transaction that was processed.  IWB also paid IRN other fees including, but not limited to, fees for chargebacks.  IRN further profited from the cash advances that it made to IWB.

85.     Despite knowing, or consciously avoiding knowing, the illegal nature of the IWB Defendants' business, IRN continued to process millions of dollars of credit card transactions for IWB, thereby earning considerable fees for itself while allowing the IWB Defendants to harm thousands of consumers who purchased the IWB Defendants' bogus credit card interest rate reduction services.

## VIOLATIONS OF THE FTC ACT

86.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

87.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  15 U.S.C. § 45(a).

## COUNT ONE - THE IWB DEFENDANTS

### Misrepresenting Material Facts

88.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit card interest rate reduction services, the IWB Defendants have represented, directly or indirectly, expressly or by implication, that:

A.     Consumers who purchase the IWB Defendants' credit card interest rate reduction services will have their credit card interest rates reduced substantially;

B.     Consumers who purchase the IWB Defendants' credit card interest rate reduction services will save thousands of dollars in a short time as a result of lowered credit card interest rates; and

C.     Consumers who purchase the IWB Defendants' credit card interest rate reduction services will be able to pay off their debts much faster, typically twice as fast, as a result of lowered credit card interest rates.

89.     In truth and in fact, the representations set forth in Paragraph 88 of this Complaint were false or not substantiated at the time the representations were made.

90.     Therefore, the IWB Defendants' representations as set forth in Paragraph 88 of this Complaint are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C.§ 45(a).

## COUNT TWO - THE IWB DEFENDANTS

### Refund Misrepresentations

91.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit card interest rate reduction services, the IWB Defendants have represented, directly or indirectly, expressly or by implication, that the IWB Defendants will provide full refunds if consumers do not save thousands of dollars in a short time as a result of lowered credit card interest rates.

92.     In truth and in fact, in numerous instances in which the IWB Defendants have made the representation set forth in Paragraph 91 of this Complaint, the IWB Defendants do not provide full refunds when consumers do not save thousands of dollars in a short time as a result of lowered credit card interest rates.

93.     Therefore, the IWB Defendants' representation as set forth in Paragraph 91 of this Complaint is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C.§ 45(a).

## COUNT THREE - THE IWB DEFENDANTS

### Unauthorized Billing

94.     In numerous instances, the IWB Defendants have caused billing information to be submitted for payment without having obtained previously consumers' express informed consent.

95.     The IWB Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

96.     Therefore, the IWB Defendants' practice as described in Paragraph 94 above constitutes an unfair act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## THE TELEMARKETING SALES RULE

97.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

98.     As amended, effective September 27, 2010, and October 27, 2010, the TSR addresses the telemarketing of debt relief services.  The amendments effective September 27, 2010, among other things, prohibit misrepresentations about material aspects of debt relief services.  The amendments effective October 27, 2010, prohibit sellers and telemarketers from charging or collecting an advance fee before renegotiating, settling, reducing, or otherwise altering consumers' debts.

99.     The IWB Defendants are "seller[s]" and/or "telemarketer[s]" engaged in "telemarketing," and Defendants have initiated, or have caused telemarketers to initiate, "outbound telephone call[s]" to consumers to induce the purchase of goods or services, as those terms are defined in the TSR, 16 C.F.R. § 310.2(v), (aa), (cc), and (dd).  Defendants also are sellers or telemarketers of "debt relief service[s]," as defined by the TSR, 16 C.F.R. § 310.2(m).

100.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of the goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

101.     As amended, effective September 27, 2010, the TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service.  16 C.F.R. § 310.3(a)(2)(x).

102.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies.  16 C.F.R. § 310.3(a)(2)(iv).

103.     As amended, effective October 27, 2010, the TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

A.     The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

B.     The consumer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

C.     To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either (1) bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount; or (2) is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.  16 C.F.R. § 310.4(a)(5)(i).

104.     The TSR prohibits sellers and telemarketers from causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the consumer.  16 C.F.R. § 310.4(a)(7).

105.     The TSR prohibits a person from providing substantial assistance or support to any seller or telemarketer when that person "knows or consciously avoids knowing" that the seller or telemarketer is engaged in acts or practices that violate Sections 310.3(a), (c) or (d), or 310.4 of the TSR.  16 C.F.R. § 310.3(b).

106.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### COUNT FOUR - THE IWB DEFENDANTS

### Misrepresentations in Violation of the TSR

107.     In numerous instances, in connection with the telemarketing of goods and services, the IWB Defendants have misrepresented, directly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of such goods and services, including, but not limited to, that:

A.     Consumers who purchase the IWB Defendants' credit card interest rate reduction services will have their credit card interest rates reduced substantially;

B.     Consumers who purchase the IWB Defendants' credit card interest rate reduction services will save thousands of dollars in a short time as a result of lowered credit card interest rates; and

C.     Consumers who purchase the IWB Defendants' credit card interest rate reduction services will be able to pay off their debts much faster, typically twice as fast, as a result of lowered credit card interest rates.

108.    The IWB Defendants' acts and practices, as described in Paragraph 107 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

## COUNT FIVE - THE IWB DEFENDANTS

### Misrepresentations of Debt Relief Services in Violation of the TSR

109.    In numerous instances on or after September 27, 2010, in connection with the telemarketing of debt relief services, the IWB Defendants have misrepresented, directly or by implication, material aspects of the debt relief services, including, but not limited to, that:

A.     Consumers who purchase the IWB Defendants' credit card interest rate reduction services will have their credit card interest rates reduced substantially;

B.     Consumers who purchase the IWB Defendants' credit card interest rate reduction services will save thousands of dollars in a short time as a result of lowered credit card interest rates; and

C.     Consumers who purchase the IWB Defendants' credit card interest rate reduction services will be able to pay off their debts much faster, typically twice as fast, as a result of lowered credit card interest rates.

110.    The IWB Defendants' acts and practices, as described in Paragraph 109 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## COUNT SIX - THE IWB DEFENDANTS

### Refund Misrepresentations in Violation of the TSR

111.    In numerous instances, in the course of telemarketing goods and services, the IWB Defendants have misrepresented, directly or by implication, that the IWB Defendants will provide full refunds if consumers do not save thousands of dollars in a short time as a result of lowered credit card interest rates.

112.    The IWB Defendants' acts and practices, as described in Paragraph 111 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(iv).

## COUNT SEVEN - THE IWB DEFENDANTS

### Charging or Receiving a Fee in Advance of Providing Debt Relief Services

113.    In numerous instances on or after October 27, 2010, in the course of telemarketing debt relief services, the IWB Defendants have requested or received payment of a fee or consideration for a debt relief service before (a) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (b) the customer has made at least one payment pursuant to that agreement.

114.    The IWB Defendants' acts or practices, as described in Paragraph 113 above, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## COUNT EIGHT - THE IWB DEFENDANTS

### Unauthorized Billing

115.    In numerous instances, in the course of telemarketing goods and services, the IWB Defendants have caused billing information to be submitted for payment without the express informed consent of the consumer.

116.    The IWB Defendants' acts and practices, as described in Paragraph 115 above, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(7).

## COUNT NINE - IRN

### Assisting and Facilitating Deceptive and Abusive
### Telemarketing Acts or Practices in Violation of the TSR

117.    In numerous instances, IRN provided substantial assistance or support to the IWB Defendants whom IRN knew, or consciously avoided knowing, were engaged in violations of the TSR set forth in Counts Four through Eight of this First Amended Complaint.

118.    IRN's acts or practices, as described in Paragraph 117 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

119.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

120.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

121.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. § 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.      Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and the appointment of a receiver;

B.      Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully Submitted,

DAVID C. SHONKA
Acting General Counsel

Dated: June 4, 2013      _____

S. SPENCER ELG, Trial Counsel
(Georgia Bar No. 940592)

225 Peachtree Street, Suite 1500
Atlanta, Georgia 30303
Telephone:      (404) 656-1354
Facsimile:      (404) 656-1379
E-mail:      selg@ftc.gov

Attorneys for Plaintiff,
FEDERAL TRADE COMMISSION